J-A20026-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.D., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 436 WDA 2021 |

Appeal from the Order Entered March 9, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s):  CP-02-AP-0000188-2020

BEFORE:  PANELLA, P.J., BENDER, P.J.E., and McCAFFERY, J.

MEMORANDUM BY BENDER, P.J.E.:          **FILED:  September 13, 2021**

A.L. ("Mother") appeals from the order dated March 1, 2021 and entered March 9, 2021, which granted the petition filed by the Allegheny County Office of Children, Youth, and Families ("CYF") to involuntarily terminate her parental rights to her minor child, K.D. (born in March of 2019) ("Child"), pursuant to sections 2511(a)(2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1]  After careful review of the record and applicable law, we affirm.

The orphans' court summarized the relevant facts and procedural history of this matter in its Pa.R.A.P. 1925(a) opinion:

> [CYF] obtained an emergency custody order shortly after [the] birth [of Child,] and she was placed into the relative foster home of paternal step-grandmother and paternal grandfather [("Foster Parents")] on May 18, 2019.  Prior to her birth, CYF was already involved with … Child's older, biological brother due to substance

---

[1] The parental rights of M.J.D. ("Father") were also terminated on the same date; however, he has not filed an appeal.

abuse and mental health concerns [regarding] both parents, inappropriate caregivers[,] and inappropriate housing. A petition for aggravated circumstances was filed and an order was entered granting the petition regarding … Child's biological sibling in November 2018[,] due to a lack of visitation and contact between the parents and that sibling, and this court ordered no reasonable efforts to reunify. At the shelter hearing on May 20, 2019, … Child was placed into the relative foster home of paternal step-grandmother and paternal grandfather, where she remains to [the] present day.

CYF filed a dependency petition on May 24, 2019[,] and an amended dependency petition on June 27, 2019, which largely outlined the same historical concerns during CYF's continued involvement with this family: inappropriate housing, drug and alcohol use, mental health issues, concerns about parenting, cooperation with CYF, and lack of contact with … Child…. Child was adjudicated dependent on June 3, 2019. Subsequent to the adjudication, CYF and this court identified several goals for Mother to address related to the aforementioned issues that brought … Child into care. Mother was to have a drug and alcohol assessment and follow through with any recommendations, submit to random drug screens, sign releases of information to verify her progress in treatment, undergo a mental health evaluation and follow through with any recommended treatment, visit with … Child, participate in a coached visitation program, obtain and maintain stable and appropriate housing, and cooperate with the Urban League.

After the adjudication hearing, there were four permanency review hearings held before this court. At the first permanency review hearing, this court found that Mother was in moderate compliance and [had] made minimal progress towards remedying the conditions. At each subsequent permanency review hearing, this court found that Mother was in minimal compliance and [had] made minimal progress towards remedying the conditions that led to [Child's] removal. CYF filed a petition to involuntarily terminate Mother's parental rights on December 2, 2020.

Throughout the duration of this case, … Child has remained in the same relative foster home where she was placed immediately after birth, and this court has routinely made findings that … Child is doing well in this home and her needs are being met.

Orphans' Court Opinion ("OCO"), 5/4/21, at 2-4 (unnecessary capitalization, footnote, and citations to record omitted).

A termination hearing was held on March 1, 2021, at which multiple witnesses were called by CYF, and Mother and Father both testified. On the same date, the orphans' court issued an order, which was entered on March 9, 2021, terminating Mother's parental rights to Child, pursuant to 23 Pa.C.S. §§ 2511(a)(2), (5), (8), and (b). On April 8, 2021, Mother filed a timely notice of appeal, along with a concise statement of matters complained of on appeal, pursuant to 23 Pa.C.S. § 2511(a)(2)(i).

Herein, Mother presents the following issues for our review:

1. Did the [orphans'] court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights[,] pursuant to 23 Pa.C.S. § 2511(a)(2), (5), and (8)?

2. Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of … [C]hild[,] pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 6.

We review an order terminating parental rights in accordance with the following standard:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury

- 3 -

verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under [s]ection 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [s]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [s]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between

- 4 -

> parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

With regard to section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

In this case, the trial court terminated Mother's parental rights pursuant to sections 2511(a)(2), (5), (8), and (b). We need only agree with the trial court as to any one subsection of section 2511(a), as well as section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate under section 2511(a)(8) and (b), which provide as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

***

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

***

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

We first address whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to section 2511(a)(8).

"[T]o terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1226, 1275-76 (Pa. Super. 2003); 23 Pa.C.S.[] § 2511(a)(8). "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003). Once the 12-month period has been established, the court must next

- 6 -

determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period. *Id.* Termination under Section 2511(a)(8) does *not* require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services. *In re Adoption of T.B.B.*, 835 A.2d 387, 396 (Pa. Super. 2003); *In re Adoption of M.E.P.*, *supra*.

*In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010) (emphasis added).

Here, Mother claims that the orphans' court erred in terminating her parental rights pursuant to section 2511(a)(8). She argues that there was insufficient evidence to support a finding that the conditions which led to the removal of Child from her care have not been remedied and that termination would best serve Child's needs and welfare. Mother's Brief at 14. More specifically, Mother asserts that CYF presented no evidence that she was still smoking marijuana or that such usage would render her unable to provide care for Child. *Id.* at 18. She further contends that CYF failed to prove that Mother had to remedy her mental health in order to be able to care for Child. *Id.* at 19. Mother completed a drug assessment with the PA Organization for Women in Early Recovery ("POWER"); however, she asserts that due to her social anxiety disorder, she was unable to provide urine screens through the environment of the Allegheny County Health Department ("ACHD"). *Id.* at 20. *See also* N.T. Hearing, 3/1/21, at 119 (Mother's explaining that she does not like "peeing in front of somebody").

Additionally, Mother argues that her failure to complete coached visitation should not have been considered by the court, because there was

no testimony to establish that she required coached visitation in order to properly care for Child. *Id.* at 21. Rather, she avers that CYF had "no alarming concerns with [her] parenting" and, thus, there was no need for her to improve upon those skills. *Id.* Mother also claims the court erred in faulting her for declining virtual visitation, as she suggests such visitation at Child's young age would not allow for a meaningful connection. *Id.* at 21-22. Finally, Mother attempts to deflect the blame from herself for the fact that she never progressed to unsupervised visitation. *Id.* at 22. She states that "many visits were missed due to transportation or scheduling issues[,]" that CYF failed to provide her with gas cards to assist her in getting to drug screens and to pursue other goals, and that CYF failed to arrange a time to assess the new housing she obtained in June 2020. *Id.* at 22-23. Mother has failed to convince us that she is entitled to any relief on this claim.

As to the first element of section 2511(a)(8), concerning whether Child has been removed from parental care for twelve months or more, the record is clear that Child was placed with Foster Parents in May 2019, which amounted to approximately 22 months at the time of the termination hearing. Child has never resided with Mother, as she was placed in the foster home just two days after her birth. Thus, the statutory period of twelve months has clearly been met.

As to the second element of section 2511(a)(8), regarding whether the conditions which led to Child's removal continue to exist, the orphans' court listed the following concerns as the reason Child was placed into foster care:

inappropriate housing, drug and alcohol use, mental health issues, concerns about parenting, cooperation with CYF, and lack of contact with … Child." OCO at 2-3. In support of its decision that these conditions still exist, the orphans' court indicated that, at the time of the termination hearing, "the only goal that Mother … achieved was appropriate housing, which [she] obtained in June 2020." *Id.* at 7.

The court further opined:

> With respect to Mother's drug and alcohol goal, this court … consistently found that Mother made minimal progress. In the order adjudicating … Child dependent on July 3, 2019, this court indicated in the finding of fact that "[Mother and Father] have had the same goals for years. When [Child's older biological sibling] came into care[,] they had evaluations and were recommended for [intensive outpatient treatment ("IOP")]/dual diagnosis. [Mother and Father] completed the intake at [Mercy Behavioral Health] but never followed through[.] Mother reports using THC years ago but denies any current use. Mother denies any mental health history or concerns. The agency has had a goal of dual diagnosis for years[.] There was testimony today that Mother slept during an entire visit on the couch. There was a concern that she slept during a doctor appointment and did not interact with … Child." Mother was referred to POWER at the beginning of the case, where she was not recommended for treatment because of her self-reporting and being able to provide a clean screen. The caseworker testified that Mother did complete an individual evaluation with the court[-]appointed forensic evaluator, Dr. Terry O'Hara, who recommended dual diagnosis treatment for Mother. Mother reported to the caseworker that she was in drug and alcohol treatment at different points during the case; however, the caseworker testified that Mother's phone number would change, she was inaccessible at times, and the caseworker had been trying to get releases of information signed so she could verify treatment. At the adjudication, this court ordered "Mother [to] participate in random urine screens[. O]nce she provides three clean screens she can stop." Mother refused to participate in random screens done by the [ACHD,] because "Mother said she didn't feel comfortable in front of anybody doing the screens." The

caseworker testified that Mother ultimately provided three screens that she had obtained independently at "Med Express or one of those places[,]" but that one of those screens "was two days later than when she was called in[,]" and so CYF only accepted two of those three screens as being validly random. In her testimony, Mother stated that she would not participate in urine screens because[,] "I just don't like peeing in front of somebody. I don't even like somebody hearing me pee, let alone watch [*sic*] me pee."

Mother had a goal to address any mental health concerns. The caseworker testified that CYF did not have any documentation to show that Mother had participated in any mental health treatment. Early in the case, Dr. [] O'Hara … completed an individual evaluation of Mother and then conducted a re[-]evaluation with Mother in January 2021. Dr. O'Hara diagnosed Mother with social anxiety, which had been a problem for her historically, as well as a stimulant use disorder [(]amphetamine substance, mild[)] and a cannabis use disorder, moderate. Ultimately, Dr. O'Hara testified that he did not have any evidence that Mother had addressed historical concerns or evidence that she made substantive progress with dual diagnosis treatment, and that he was unable to substantiate her clean time at all. Mother testified that she did not feel she needed to be in mental health treatment to parent her Child and that she was not willing to engage in counseling or therapy to help with her mental health. Mother's testimony at the time of the termination proceeding was that she was involved at Anchorpoint and described it as a "one-size-fits-all kind of thing [and] … a place where you can go and talk to someone about your problems." Mother testified that she had signed a release of information for that program despite the CYF caseworker['s] testifying that Mother's involvement hasn't been verified.

Participating in coached visitation, to address parenting[] skills, was a goal for Mother. The CYF caseworker testified that Mother did one intake but after the intake Mother failed to confirm times for the visitation and so the program closed out. Mother was re-referred to coached visitation a second time and it closed again due to non-compliance. Mother provided her own explanation, in her testimony, and stated that "[t]he reason it got canceled out for our first one is because of an electronic error. The second time, we confirmed six minutes too late and then they canceled it out." Mother indicated that she did not think she needed parenting classes in order to care for … Child.

- 10 -

Mother had a goal of visitation. From the outset of the case, Mother was permitted liberal supervised visits at the [Foster Parents'] home but did not avail herself of those visits more than a couple of times. The caseworker testified that "Paternal step-grandmother was—she would permit them to … visit any time they wanted to, and the parents never really did that." The CYF caseworker testified that the agency then scheduled weekly supervised visits at maternal grandmother's residence, and Mother did participate in those visits. Mother would have had the opportunity to expand into more visitation had she and Father cooperated with the initial coached visitation referral. This court ordered another referral to coached visitation in January 2020, which the agency made in February 2020, but all in[-]person visits went on hold in March 2020[,] due to the Covid pandemic. The CYF caseworker testified that they shifted to scheduling virtual visits and … Child's foster care agency called and notified Mother of this change. Mother told the foster care agency that she did not want to participate in virtual visits with her child. The CYF caseworker reported that they were able to resume in-person supervised visitation in June 2020[,] and CYF was able to facilitate an in-person visit with Mother on June 24, 2020[,] and June 30, 2020. The CYF caseworker testified that yet another referral was made to coached visitation[,] but that was again closed out due to parental non-compliance. The CYF caseworker testified that in large part, Mother was able to attend the in-person supervised visitation during that time, with the exception of some missed visits due to CYF transportation issues and some due to parent cancellation. However, when the Covid numbers started rising again in the fall, the caseworker testified that visits were changed [to] once weekly in-person supervised and once weekly virtual, and Mother again refused all virtual visits. In her testimony, Mother acknowledged that she did not participate in any of the offered virtual visits because she didn't think it was "meaningful" and thought it would be hard to maintain the bond over virtual contact.

This court found Mother's testimony to be lacking credibility. It was this court's opinion that Mother tended to blame others or make excuses and she failed to acknowledge her role and responsibility in the situation. Mother also seemed to struggle with her own personal hurdles, such as providing random urine screens, which prevented progress towards reunification. Other than her own testimony, Mother did not provide any evidence or call any witnesses to rebut CYF's case. The court recognizes that

Mother obtained appropriate housing in June 2020. Nevertheless, this court could not disregard lack of progress or documentation of progress on Mother's other Family Service Plan goals. CYF, clearly and convincingly, presented testimony and evidence that Mother either could not or would not remedy the conditions that led to the removal.

OCO at 7-12 (unnecessary capitalization, citations to record, and footnote omitted).

As to the third element of section 2511(a)(8), the orphans' court found CYF demonstrated, clearly and convincingly, that termination of Mother's parental rights would best serve the needs and welfare of Child. *Id.* at 13. Dr. O'Hara testified about his observations during court-ordered evaluations and interactional assessments between Child and Foster Parents, and between Child and Mother. He indicated that Mother showed several positive parenting skills, but that she was also relatively quiet with Child for periods of time. *Id.* He observed that Mother has difficulty setting limits for Child. *Id.*; *see also* N.T. Hearing at 61 (Dr. O'Hara's noting "there's a lot of research about overly permissive parenting and how that can influence behavioral concerns for children"). Moreover, Dr. O'Hara was concerned that Mother had not addressed her historical substance abuse and mental health issues. *Id.* at 14. He concluded that Mother was not in a position to appropriately care for Child's needs and welfare at this point. *Id.* Contrarily, CYF presented evidence that Child is thriving in her foster home and shares a bond with Foster Parents. *Id.* at 14-15. We deem the orphans' court's determination under section 2511(a)(8) to be well-supported by the record, and we discern no abuse of discretion.

As for the orphans' court's analysis under section 2511(b), Mother claims there was insufficient evidence to clearly prove that termination of her parental rights would best serve the needs and welfare of Child. Mother's Brief at 25. She argues that Child experiences joy during in-person visits with her and that termination would unnecessarily and permanently deprive Child of the benefits of their relationship. *Id.* According to Mother, "[Child] derives the benefit of affection and happiness from her relationship with Mother. The only way to ensure [Child] will continue to benefit from her relationship with [M]other is to restore Mother's parental rights." *Id.* at 26. Mother's claim is without merit.

While we recognize that Mother has demonstrated some positive parenting skills, the record reflects that both Mother and Child were relatively quiet for periods of time during their interactional evaluation. OCO at 13. Mother failed to make substantive progress on her plan goals, and Dr. O'Hara did not believe she was in a position to appropriately care for Child's needs and welfare. *Id.* at 14. On the other hand, a CYF caseworker observed several interactions between Child and Foster Parents and testified that Child "appears to be very close to the grandparents[. W]hen I am there on the visits, [Child] will sit with [paternal step-grandmother]. They get along quite well." *Id.* (quoting N.T. Hearing at 34). She further reported that Foster Parents are meeting all of Child's psychological, developmental, and medical needs. *Id.*

Additionally, the permanency adoption caseworker for CYF stated that he had opportunities to observe Child in the foster home and described Child as a "healthy, happy little girl[."] *Id.* at 15 (quoting N.T. Hearing at 54). He testified that the interactions between Child and Foster Parents were "very loving and nurturing. She is clearly bonded to them, in my opinion." *Id.* (quoting N.T. Hearing at 55).

The orphans' court concluded:

Child was placed into this foster home directly from the hospital because her parents were not ready, willing[,] or able to provide care for her. From that point forward, despite services, multiple referrals, and transportation assistance, Mother failed to address her family service plan goals or consistently visit and develop a relationship with her newborn Child. At the time of the termination proceeding on March 1, 2021, … Child was twenty-two months old and had spent her entire life outside of the care of her Mother. As a direct result, … Child has bonded and attached to … Foster Parents, her paternal step-grandmother and grandfather, who have consistently met all her emotional, developmental, and physical needs.

Thereby, this [c]ourt was well within its discretion and within the established caselaw when it determined that severing … Child's bond with … Mother [would not] cause extreme emotional consequences for … Child, and that any negative consequences that would result from such termination would be mitigated by any subsequent bond … Child established with … [F]oster [P]arents.

*Id.* at 15-16. We are convinced that the orphans' court carefully considered Child's best interest in reaching its decision. We discern no abuse of discretion as to section 2511(b).

Accordingly, we affirm the order terminating Mother's parental rights to Child, pursuant to 23 Pa.C.S. §§ 2511(a)(2), (5), (8), and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  9/13/2021